# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division



UNITED STATES of AMERICA,      :            CIVIL ACTION

    Plaintiff,                 :

      v.                     :

PETER G. ARCHIBALD,            :

    Defendant.                 :            NO. CV205-029

## O R D E R

On November 14, 2005, a jury convicted Peter G. Archibald of bankruptcy fraud. Presently before the Court is Archibald's motion for a judgment of acquittal or, in the alternative, motion for a new trial. Because there is substantial evidence justifying an inference of guilt, Archibald's motion for a judgment of acquittal will be **DENIED**. Because the verdict is not contrary to the weight of the evidence, Archibald's motion For a new trial will be **DENIED**.

**BACKGROUND**

On December 30, 2003, Peter G. Archibald, and his wife, Barbara F. Archibald, filed a voluntary bankruptcy petition pursuant to Chapter 13 of the Bankruptcy Code. The Archibalds filed their petition under penalty of perjury in the United States Bankruptcy Court for the Southern District of Georgia.

The Archibalds were indicted for bankruptcy fraud relating to the concealment of property in this petition. Under the heading "Current Market Value of Debtor's Interest in Property . . ." on the bankruptcy form, the Archibalds listed their interest in Rooster's Barnyard, Inc. ("Rooster's"), a night club featuring female nude dancers, at $2,000.

According to the indictment, the couple fraudulently concealed the assets of Rooster's, a corporation wholly owned by the Archibalds, consisting of real property and improvements located in DeKalb County, Georgia. The government also charged that the Archibalds knowingly and fraudulently made a false oath or account in relation to their bankruptcy petition, by substantially undervaluing the assets of Rooster's.

At trial, the government contended that the Archibalds could be held accountable for concealing and undervaluing the assets of Rooster's because they had disregarded the

2

corporation's separate existence. The government's first witness, Assistant United States Bankruptcy Trustee Bruce Amon James testified that the true value of Defendants' stock in Rooster's needed to be included in the Chapter 13 schedule.

Representatives of three different financial institutions also took the witness stand and explained financial affidavits filled out by Peter Archibald, wherein he assessed his (and his wife's) interest in Rooster's at three to five million dollars. In one of Mr. Archibald's financial affidavits, he attested that the market value of the couple's stock in the company was worth three million dollars. Govt. Ex. No. 4E at 2.

The Archibalds strongly denied the charges against them. Peter Archibald claimed that he completed the bankruptcy petition to the best of his ability, relying in good faith on the advice of his attorney's assistant, and stated that he lacked any intent to defraud the federal government or his creditors. Mr. Archibald testified that he did not know how to value his interest in Rooster's. Similarly, Barbara Archibald asserted that she acted in good faith in signing the bankruptcy petition based upon her husband's representations to her, and maintained that she lacked any fraudulent intent in the matter.

3

Before submitting the case to the jury, the Court granted Barbara Archibald's motion for a judgment of acquittal. The jury deliberated, and convicted Peter Archibald of both counts of the indictment.[1]

## STANDARD FOR GRANTING A JUDGMENT OF ACQUITTAL OR A NEW TRIAL

Under Rule 29(a) of the Federal Rules of Criminal Procedure, "[a]fter . . . the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Judge Prettyman explained the standard to be applied as follows:

---

[1]

The government has argued that it is a violation of the Federal Rules of Criminal Procedure to consider Defendant's supplemental brief, filed on January 18, 2006, which contains numerous citations to the trial transcript, and otherwise enlarges upon Defendant's previous arguments attacking the verdict. While the Court agrees that Rules 29(c) and 33(b)(2) of the Federal Rules of Criminal Procedure require that Defendant move for a judgment of acquittal and a new trial within seven days of the verdict, Defendant complied with that mandate. On November 14, 2005, the jury convicted Peter Archibald on both counts of the indictment. On November 21, 2005, Defendant filed his motion for a judgment of acquittal or a new trial. See Dkt. Nos. 68 & 72. The government has cited no authority supporting its argument that a defendant, having filed his motion in a timely fashion, cannot thereafter offer a supplemental brief citing to a transcript of the trial when the transcript becomes available, and the Court rejects such an approach as inconsistent with the Court's duty to consider the merits of the legal arguments brought before it. See, e.g., United States v. Bouzanis, No. 00 CR 1065, 2004 U.S. Dist. LEXIS 17239 at *5-6 (N.D. Ill. Aug. 30, 2004) (indicating that a supplemental brief, filed while the original motion was still under advisement, could be considered).

4

The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter.

Curley v. United States, 160 F.2d 229, 232-33 (D.C. Cir. 1947).

"The verdict may be based in whole or in part on circumstantial evidence. The evidence need not exclude every reasonable hypothesis except that of guilt. . . ." Tibbs v. Florida, 457 U.S. 31, 38 n.11 (1982)(quoting United States v. Lincoln, 630 F.2d 1313, 1316 (8th Cir. 1980)).

Pursuant to Federal Rule of Criminal Procedure 33, upon a defendant's motion, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." The Court possesses broader authority to order a new trial than it has to enter a judgment of acquittal. In considering a motion for a new trial, the Court "may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." Id. In exceptional cases, the Court may set aside the

AO 72A
(Rev. 8/82)

conviction and order a new trial where the evidence weighs heavily against the verdict. Id.

## DISCUSSION

Archibald makes several arguments in support of his motion. While Archibald's complaints are too many to summarize conveniently, he finds fault in five major particulars. First, he argues that the government's evidence and the Court's jury instructions were so different from the allegations in the indictment that the trial was rendered unfair. Second, Archibald contends that the prosecution was fundamentally flawed because it was based upon an incorrect understanding of bankruptcy law.

Third, Defendant asserts that the government violated Federal Rule of Evidence 404(b), and committed prosecutorial misconduct, by offering his 1991 bankruptcy petition into evidence and by mischaracterizing the same. Fourth, Archibald claims that the government failed to rebut his "reliance of counsel's staff" defense. Fifth, Archibald asserts that the Court may have instructed the jury improperly in response to a question it sent to the Court while deliberating.[2]

---

[2]

(continued...)

AO 72A
(Rev. 8/82)

## I.   <u>CONSTRUCTIVE AMENDMENT OR PREJUDICIAL VARIANCE</u>

Archibald contends that the indictment was amended by the evidence presented by the government and by the Court's jury instructions.  In the alternative, Archibald argues that a prejudicial variance in proof, and in the Court's charge to the jury, violated his rights.

Federal Rule of Criminal Procedure 7(c)(1) provides, in pertinent part, that "[t]he indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government."  "A court cannot permit a defendant to be tried on charges that are not made in the indictment against him."  <u>Stirone v. United States</u>, 361 U.S. 212, 217 (1960).

Where the evidence at trial, or the Court's jury instructions, deviate from what is alleged in the indictment, a constructive amendment or a variance may occur.  While constructive amendment of an indictment is per se reversible error, variance in proof is permissible, so long as the change

---

[2](...continued)
The Court rejects Defendant's cursory assertion that the Court erred in failing to require FBI Agent Tony Alig to produce his rough, handwritten notes after testifying, pursuant to Defendant's Jenck's Act request, as clearly erroneous.  See <u>United States v. Soto</u>, 711 F.2d 1558, 1562 (11th Cir. 1983).

7

does not prejudice the defendant's rights substantially. United States v. Keller, 916 F.2d 628, 633 (11th Cir. 1990).

> [A]mendment occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment.  A variance occurs when the facts proved at trial vary from the facts contained in the indictment, but the essential elements of the offense are the same.

Id. at 634.

Archibald's argument that constructive amendment occurred need not detain the Court long.  The government charged that Defendant committed the crimes of concealing assets on his bankruptcy petition and of making a false oath or account by undervaluing assets on the petition.  At trial, it presented proof in support of those contentions, and the Court instructed the jury on the law regarding those crimes.  Neither the government nor the Court misstated the elements of the relevant offenses.  Archibald has not explained what other crimes, or what inaccurate elements of the offenses, were invoked by the evidence or the jury instructions.  In short, it appears that Defendant has confused the concepts of constructive amendment and prejudicial variance.

The Court will consider Archibald's arguments regarding prejudicial variance below, first considering the government's

8

proof in the case, and then addressing the Court's instructions to the jury on the law.

## A. EVIDENCE PRESENTED BY THE GOVERNMENT

When considering whether a <u>prejudicial</u> variance occurred, the Court views "the evidence in the light most favorable to the government to determine whether there is substantial evidence to support the jury's verdict." <u>United States v. Church</u>, 955 F.2d 688, 697 (11th Cir. 1992).

> Simple variance between allegation and proof is harmless error as long as (1) the accused is definitely informed of the charges against him so that he can prepare a defense and will not be surprised by the evidence offered at trial, and (2) he is protected against another prosecution for the same offense.

<u>United States v. Hall</u>, 632 F.2d 500, 504 (5th Cir. 1980).[3]

Archibald suggests that the government's evidence varied from the indictment in three respects. First, the indictment described the property concealed and undervalued as "the assets of Rooster's Barnyard, Inc." Accordingly, Archibald avers, any evidence concerning any property other than something that was

---

[3]

In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

an asset of the corporation constituted a prejudicial variance from the indictment, which allowed the jury to convict based on evidence not charged therein.    Particularly, Archibald protests that evidence regarding the value of Archibald's stock in Rooster's was not relevant because the stock was not an asset of the corporation.

Second, Archibald asserts that the language of the indictment "consisting of real property and improvements located thereon" further narrowed the scope of evidence admissible to prove the crimes charged.   As Defendant notes, there was no evidence at trial that the corporation owned any real property.    Instead, the evidence of record demonstrated that the company leased the land on which it operated its adult entertainment business.   Archibald argues that the introduction of evidence relating to the concealment of any property other than real property and improvements located thereon unconstitutionally broadened the basis on which the jury could return a conviction.

Third, Defendant complains that the evidence offered in support of the government's theory of piercing the corporate veil was another prejudicial variance.   According to Archibald,

10

the indictment did not charge that the corporate form of Rooster's had been disregarded or abused.

> Yet, the Supreme Court has explained that

> As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes <u>or other means of committing the same crime</u>. . . . Convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment. A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as 'a useless averment' that 'may be ignored.'

<u>United States v. Miller</u>, 471 U.S. 130, 136 (1985) (emphasis added) (quoting <u>Ford v. United States</u>, 273 U.S. 593, 602 (1927)).

Under <u>Miller</u>, Archibald's prejudicial variance arguments appear meritless. The indictment plainly put Archibald on notice that he was accused of committing two separate types of bankruptcy fraud, concealment of assets and making a false oath or account regarding the same. Moreover, the government's indictment also showed that this crime related to Archibald's representations regarding his interest in Rooster's.

According to the evidence at trial, DeKalb County issues only a limited number of permits or licenses for the operation of bars that feature "exotic" dancers. The permits, which are

11

alienable, expire after a number of years and must be renewed if the establishment is to continue operating. If local officials become apprised of alcohol violations, the presence of illegal drugs, fights, illegal behavior between dancers and customers, or other lawlessness, they are less likely to renew the business' permit. Archibald paid the DeKalb County government tens of thousands of dollars each year to keep Rooster's license, and the evidence at trial indicated that the license alone is worth millions of dollars.

Archibald also testified that the business owned the tangible property located at the business establishment, such as tables, chairs, and various inventory items. Moreover, as an established business, Rooster's possessed other intangibles that had value if Archibald decided to sell it, including its trade name and the good will that any carryover employees might have engendered among regular customers.

In one loan application, Archibald reported that the stock that he and his wife held in Rooster's was worth three million dollars. In other loan applications and financial affidavits, Archibald valued his (and his wife's) interest in Rooster's at three to five million dollars. In a hearing before Bankruptcy Judge Lamar W. Davis, Jr., on January 7, 2004, Archibald

12

testified that the business was worth about four million dollars.

Other inculpatory evidence appeared on the bankruptcy petition itself. In addition to stating his (and his wife's) interest in Rooster's was $2,000, Archibald listed two other companies, P.G. Archibald, Inc., and Sandtrap, Inc., as having no market value. According to the evidence presented at trial, neither of these corporations, a restaurant and a bar, respectively, were commercially successful.

The fact that Archibald put "[$]0.00" beside both of these ventures tends to prove that Archibald understood what the phrase "current market value" meant, because Archibald testified that he continued to invest in these businesses, despite their failure to earn profits. This fact makes it more plausible that Archibald's incorrect valuation of Rooster's was not an accident or mistake.

In sum, there was evidence that Archibald undervalued his interest in Rooster's by more than ninety-nine percent of its actual current market value. Because Rooster's is a privately held company, wholly owned in equal shares by Archibald and his wife, half the company's value is reflected in Archibald's shares of stock. The jury heard evidence that Archibald's

13

interest in this stock was worth 1.5 to 2.5 million dollars. As a result, there was evidence that Archibald concealed assets in his bankruptcy petition and that he made a false oath or account by undervaluing his interest in Rooster's.

The additional language of the indictment, regarding the concealment and undervaluation of "the assets of Rooster's Barnyard, Inc. [,]" and further describing those assets as "consisting of real property and improvements located thereon[,]" was mere surplusage. The evidence varied from that averred in the indictment, but the variance was not material. <u>Miller</u>, 471 U.S. at 136.

Even if the Court were to assume, for the sake of argument, that the variance between the proof and the indictment was material, the variance did not affect Archibald's substantial rights. Archibald has not demonstrated unfair surprise because the alteration in proof did not change the offense charged, the elements of proof, "or the appropriate defenses in a significant manner." <u>United States v. Caporale</u>, 806 F.2d 1487, 1500 (11th Cir. 1986). While the indictment might have been crafted more finely had it stated that Archibald concealed and undervalued his interest in Rooster's, namely the stock that he held therein, the substance of that

14

averment was in the indictment.  As stated, Archibald and his wife were the sole owners of Rooster's, and as such, they had an equitable interest in all of the company's assets.

To prepare an adequate defense, Archibald was obliged to explain how he came to put $2,000 in the column asking for the current market value of his interest in Rooster's.  Because it would be folly to rest the entire defense on the fact that the indictment contained the "useless averment" that the concealment and undervaluation related to "the assets" of Rooster's Barnyard, Inc., the alteration in proof did not affect Archibald's appropriate defenses in a significant manner.

The fact that Rooster's leased the property where its business was located is immaterial.  In addition, any allegation by the government at trial regarding piercing the corporate veil was "a useless averment that may be ignored." Miller, 471 U.S. at 136 (internal quotation marks omitted).

Evidence that Archibald undervalued his interest in the stock of Rooster's was sufficient for the jury to convict Archibald of the crimes charged in the indictment; i.e., concealment of assets and making a false oath or account.[4]

---

[4]

(continued...)

15

AO 72A
(Rev. 8/82)

Archibald has not shown that he has been deprived of his "substantial right to be tried only on charges presented in an indictment returned by a grand jury." Stirone, 361 U.S. at 217.

## B.   THE COURT'S INSTRUCTIONS TO THE JURY

Archibald objects to a portion of the Court's jury instructions as a prejudicial variance from the indictment. The Court charged the jury:

> At law, a corporation has a separate existence from its stockholders. However, if a stockholder ignores the corporate form by intermingling the company's assets with his own, or otherwise disregards a company's separate existence, the law refuse to recognize the distinction between the artificial corporate entity and the natural person that [sic] owns it.
>      This is what is commonly referred to as "piercing the corporate veil." If you find that Defendant so dominated Rooster's Barnyard, Incorporated, that the company failed to have an independent corporate existence, then you may find the defendant guilty of concealment of the company's assets on the Bankruptcy Petition.
> . . . That is to say that disregard of the corporate formalities and separateness is a necessary, but not a sufficient, basis to find Defendant guilty of

---

[4] (...continued)

Defendant's assertion that the indictment fails to allege a crime is simply another version of this argument, which the Court rejects. The indictment put Archibald on notice of the crimes with which he was charged and explained that these crimes occurred in relation to his valuation of his interest in Rooster's on his bankruptcy petition. That is sufficient.

AO 72A
(Rev. 8/82)

concealment of assets of Rooster's Barnyard,
Incorporated.
    Therefore, whether property is a part of the
bankruptcy estate is a factual question for you to
decide.  A critical factor in the determination will
be whether you decide that Mr. Archibald ignored the
corporation's separate existence.

Dkt. No. 81, Transcript, Vol. III, at 53-54.

    This instruction was included in response to the language

of the indictment charging that the concealment and

undervaluation related to "the assets" of Rooster's Barnyard,

Inc., and the statements of government's counsel suggesting

that Archibald was guilty because his actions justified

piercing the corporate veil.  In hindsight, it is clear that

this instruction needlessly complicated the jury's task, and

required the government to prove more than was required in this

case.

    Yet, taken as a whole, the jury instructions were not

misleading.   The jury was instructed properly as to the

essential elements of the crimes.    The erroneous jury

instruction was not prejudicial because the evidence and the

Court's instructions on the law were otherwise adequate to

convict.   United States v. Ylda, 653 F.2d 912, 915 (5th Cir.

1981).   Because the erroneous instruction increased the

government's burden, it is difficult to see how Archibald would

17

have been in a better position had the Court omitted the questioned charge. There is not a substantial likelihood that a properly instructed jury would have acquitted Archibald. United States v. Sacony-Vacuum Oil Co., 310 U.S. 150, 219 (1940); United States v. Gallegos-Corrales, 37 F.3d 548, 550 (9th Cir. 1994).

Because there was evidence that Archibald undervalued his interest in Rooster's directly, by virtue of his stock ownership, the jury instruction was mere surplusage, and its inclusion amounted to harmless error.[5]   Kotteakos v. United States, 328 U.S. 750, 757-765 (1946).

Based upon the evidence discussed above, the Court also rejects Archibald's challenge to the sufficiency of the evidence. There was enough evidence presented for the jury to conclude that Defendant understood the market value of his

---

[5]

     Defendant also complains that the Court erred in failing to give certain requests to charge, which he first submitted during the charge conference, after the deadline imposed by the Court for such requests had passed. These requests, Defendant's Requests to Charge Nos. 14 & 16, were objectionable and contrary to law because they treated the extraneous averments in the indictment as necessary to convict. The proposed instructions would have instructed the jury to disregard the most damning and direct evidence against Archibald, which was that Archibald misrepresented the value of his stock in Rooster's. Moreover, evidence that Archibald failed to schedule over $100,000 dollars in federal tax liens on his 2003 bankruptcy petition was admissible. The Court's jury charge was comprehensive, faithful to the law and evidence, and it would not have been improved by adding either proposed instruction.

AO 72A
(Rev. 8/82)

stock in Rooster's, and that he mischaracterized that information on the bankruptcy petition with fraudulent intent.[6]

## II.   VIABILITY OF THE GOVERNMENT'S THEORY UNDER BANKRUPTCY LAW

According to Defendant, the evidence was insufficient to convict because the prosecution rested upon a flawed interpretation of bankruptcy law.  As Archibald has stated, a bankruptcy court must confirm a Chapter 13 plan if, among other things,

> the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date[.]

11 U.S.C.A. § 1325(a)(4) (2004).

In order to prove intent to deceive, Archibald argues, the government elicited Assistant Trustee James' expert opinion that disclosure of a large asset in a Chapter 13 case would motivate the creditors to move to convert the case to a Chapter 7 liquidation plan.  According to Defendant, this expert

---

[6]

While testifying, Assistant Trustee James opined that a debtor's interest in a subchapter S corporation is the stock therein, which is valued at whatever the business is worth — what it could be sold for in an arm's length transaction.  Archibald contends that evidence of his own valuation of Rooster's is insufficient to show what it might be sold for on the open market.  The Court disagrees.  Archibald's estimations of Rooster's worth is admissible to prove its value.

AO 72A
(Rev. 8/82)

opinion is actually a legal argument that Title 11 of the United States Code, section 1307(c), allows a Chapter 13 case to be converted involuntarily to a Chapter 7 case if the disclosure of a large unencumbered asset were to violate the best interests of the creditors.[7]

Archibald insists that this interpretation is unsupported by law, and that there is no precedent that supports the idea that § 1307(c) authorizes a trustee to seek conversion from a payment plan under Chapter 13 to a liquidation under Chapter 7 in order to pay creditors faster. Defendant emphasizes that, because he had more assets than liabilities, he had a 100 percent repayment plan.   Therefore, under § 1325(a)(4), Archibald's Chapter 13 plan also had to pay creditors in full. Thus, an involuntary conversion from Chapter 13 to Chapter 7 merely would have made payment in full occur sooner via liquidation than provided by the Chapter 13 payment plan.

As a result, Archibald reasons that the government's theory was that he intended to deceive his creditors by forcing them to be paid in full at the slower rate provided by Chapter 13 than by the faster method of liquidation provided by Chapter

---

[7]

Although Defendant did not object to James' testimony, Archibald now argues that it was inadmissible because an attorney, testifying as an expert, should not be permitted to explain the law to the jury incorrectly.

7.   In sum, Archibald posits that the Court should acquit Defendant because it would have been "mathematically impossible" for Defendant to have defrauded any creditors.

Yet, a bankruptcy court will not confirm a plan unless it "has been proposed in good faith and not by any means forbidden by law."   11 U.S.C.A. § 1325(a)(3) (2004).   Similarly, a bankruptcy court may dismiss or convert a Chapter 13 plan when a debtor acts in bad faith, pursuant to § 1307(c).  See, e.g., In re Green, 141 B.R. 440, 442 (Bankr. M.D. Fla. 1992); Eisen v. Curry (In re Eisen), 14 F.3d 469, 470-71 (9th Cir. 1994); In re Waldron, 785 F.2d 936, 939 (11th Cir. 1986)(interpreting § 1325(a)); see generally Matter of Love, 957 F.2d 1350, 1354-57 (7th Cir. 1992)(evaluating similarities and distinctions between separate "good faith" inquiries under § 1307(c) dismissal or conversion of bankruptcy petition, as opposed to § 1325 confirmation of bankruptcy plan).

In dismissing Archibald's bankruptcy petition, Judge Davis found that Archibald had acted in bad faith and had abused the bankruptcy process by hiding the true value of his interest in Rooster's.   Govt. Ex. No. 1 at 9 & 23.   Attempting to mislead the bankruptcy court regarding the value of a large asset is

21

demonstrative of bad faith on the part of a debtor.   <u>In re</u>
<u>Ramji</u>, 166 B.R. 288, 290 (Bankr. S.D. Tex. 1993).

More directly under the statutory scheme, and contrary to
Archibald's argument, a bankruptcy court is empowered to
convert or dismiss a case for cause when the debtor causes
unreasonable delay that would prove prejudicial to a creditor.
11 U.S.C.A. § 1307(c)(1)(2004).   One way that unreasonable
delay may occur is when a debtor lists his assets inaccurately
on his bankruptcy petition.   <u>In re Henson</u>, 289 B.R. 741, 750
(Bankr. N.D. Cal. 2003).

In sum, the government's case did not rest upon an
incorrect understanding of bankruptcy law.

## III.     ARCHIBALD'S PRIOR BANKRUPTCY PETITION

Archibald accuses the government of misconduct by
intentionally withholding disclosure of his 1991 Chapter 13
bankruptcy petition until after he had testified.   Archibald
also asserts that this evidence was inadmissible under Federal
Rule of Evidence 404(b).   <u>See</u> Dkt. No. 19 at ¶2.

## A.    ADMISSIBILITY OF ARCHIBALD'S PRIOR BAD ACT

Federal Rule of Evidence 404(b) provides:

22

> Evidence of other crimes, wrongs, or acts is not
> admissible to prove the character of a person in
> order to show action in conformity therewith.   It
> may, however, be admissible for other purposes, such
> as proof of motive, opportunity, intent, preparation,
> plan, knowledge, identity, or absence of mistake or
> accident, provided that upon request by the accused,
> the prosecution in a criminal case shall provide
> reasonable notice in advance of trial, or during
> trial if the court excuses pretrial notice on good
> cause shown, of the general nature of any such
> evidence it intends to introduce at trial.

The general principle behind this rule is that the government cannot prove guilt by pointing to the accused's prior wrongdoing.   United States v. Mills, 138 F.3d 928, 935 (11th Cir. 1998).   Evidence of other bad acts is admissible under Rule 404(b) if the government proves (1) relevancy to an issue other than the accused's character (2) that the defendant committed the prior act, and (3) that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.   Id.

These elements were satisfied in the case sub judice. First, Archibald's prior listing of Rooster's as having no value, and a creditor's objection to confirmation of his 1991 plan on that basis, tends to prove absence of mistake in the 2003 bankruptcy petition.   Govt. Ex. No. 10 at 20, line B-2/t; Govt. Ex. No. 10, Bankr. Dkt. No. 5 at ¶6.   At trial, Archibald

declared that he was ignorant of bankruptcy law, particularly regarding how to value properly his interest in Rooster's.

This exhibit was used for impeachment purposes, and it was proper to admit it into evidence over Defendant's objection. The exhibit was relevant for reasons other than showing that Defendant had a propensity to commit such acts in the past. Archibald has not disputed committing the prior act, and the probative value of this evidence was not substantially outweighed by any unfair prejudice that Archibald might have suffered.

Rule 404(b) requires the government to give adequate notice to Defendant, regardless of whether it intends to use the evidence in its case-in-chief, for impeachment, or in rebuttal. United States v. Carrasco, 381 F.3d 1237, 1240 (11th Cir. 2004). The notice requirement is intended to reduce surprise, and foster early resolution of the issue of admissibility. Fed. R. Evid. 404 advisory committee's note (1991).

However, if good cause is shown, the government may disclose such evidence during trial. The government has stated that it did not discover the 1991 bankruptcy petition until after Assistant Trustee James testified, at the conclusion of

24

the first day of trial, November 9, 2005.  The next day, the government asserts that it disclosed the evidence to Defendant.

To the contrary, Archibald rejoins that the government knew about the petition days before the trial commenced. Archibald emphasizes that the exhibit introduced into evidence was certified by the bankruptcy court clerk's office on November 7, 2005, the day of jury selection. Because the trial did not begin until two days later, Archibald concludes that it is obvious that the government's representation is false.

However, the fact that the copy was certified on November 7, 2005, does not necessarily mean that the prosecutor lied about his knowledge of the exhibit.  Among other innocent explanations, it is plausible that James obtained the exhibit on November 7, 2005, in preparation for his testimony.  The fact that the government asked witnesses whether they knew if Defendant had previous experience with Chapter 13 does not prove any wrongdoing by the government.  Such information might prove helpful to the government's case, and it was entitled to inquire about such details.

Without evidence from Archibald to support his allegation, the Court is unwilling to conclude that the government's counsel shirked his duty of candor to the tribunal so

AO 72A
(Rev. 8/82)

cavalierly. The Court finds that the government disclosed the 1991 petition to Defendant's counsel on November 10, 2005, the day after it learned of the prior bankruptcy filing. Good cause existed for the delay, considering that the government first learned of the evidence after the previous day's court proceedings had concluded. Inasmuch as Rule 404(b) was designed to reduce surprise, and Defendant knew of the prior bankruptcy filing long before the government did, the policy rationale behind Rule 404(b) has not been offended.

## B.   PROSECUTORIAL MISCONDUCT

Archibald avers that Assistant United States Attorney Brian F. McEvoy intentionally misrepresented the facts surrounding Defendant's 1991 bankruptcy petition, leaving the jury with a lasting misunderstanding of the evidence, to Defendant's detriment.

To establish prosecutorial misconduct, a defendant must prove that the prosecutor made an improper remark, or series of remarks, which prejudiced his substantial rights. United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991). In determining whether prosecutorial misconduct occurred, the Court does not focus on particular isolated remarks in a

26

vacuum, but considers the context of the entire trial. <u>United States v. Beasley</u>, 72 F.3d 1518, 1525 (11th Cir. 1996).

Courts find prejudice when the remarks "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." <u>Eyster</u>, 948 F.2d at 1206. This threshold is met only where the impropriety by the prosecutor is "so egregious as to create a reasonable probability that the outcome was changed" thereby. <u>Brooks v. Kemp</u>, 762 F.2d 1383, 1403 (11th Cir. 1985)(en banc), <u>vacated on other grounds</u>, 478 U.S. 1016 (1986).

Because the parties disagree over the content of Government Exhibit Number 10, and the prosecutor's description of it, a summary of the exhibit is necessary. Government Exhibit Number 10 is a series of documents relating to Archibald's 1991 bankruptcy petition. The "summary of debts and property" in Archibald's petition shows that Defendant listed "zero" as the value of his interest in any corporations that he owned, including Rooster's. Govt. Ex. No. 10 at 20, line B-2/t. A creditor, Citibank, N.A., filed an objection to confirmation. Govt. Ex. No. 10, Bankr. Dkt. No. 5. One of the grounds for Citibank's objection was that Archibald's petition failed to list the value of his interest in Rooster's.

27

One can fairly infer from the exhibit that the bankruptcy court held a "motion to dismiss" hearing after the creditor filed its objection.  The Bankruptcy Trustee's supplemental report stated that Archibald was given five days from the motion to dismiss hearing to convert the Chapter 13 plan to a Chapter 7 plan.  Govt. Ex. No. 10, Bankr. Dkt. No. 43.  The subsequent order of dismissal indicates that the case was dismissed for failure to comply with a direction of the court; i.e., failing to convert the case to a Chapter 7 plan.

Contrary to Defendant's representations, the prosecutor did not misrepresent Government Exhibit Number 10 repeatedly, at least not in any significant respect.  While there was not a "motion to dismiss" Archibald's petition for failure to disclose assets, that was one of the enumerated grounds for Citibank's objection to confirmation, and the bankruptcy court held a "motion to dismiss" hearing.

Likewise, while there was not an order converting the Chapter 13 petition to Chapter 7, a fair inference from the Trustee's supplemental report is that the Court ordered Archibald to undertake this action.  The bankruptcy court then dismissed the case for want of following this order. The Court does not consider it a significant distortion that the

28

government intimated that the case had been converted to a Chapter 7 plan before it was dismissed.

Upon reviewing the record, the Court finds that the prosecutor did make one improper remark. During closing argument, McEvoy stated: "He wants you to believe that he did not know the property had to be included on the Bankruptcy Petition even though he ha[d] another Chapter 13 Bankruptcy Petition dismissed for this exact same reason." Dkt. No. 81, Transcript, Vol. III, at 15. This statement was improper because it tended to mislead the jury.

There were several grounds listed by Citibank and the Trustee in their objections to confirmation of Archibald's 1991 bankruptcy petition. Govt. Ex. No. 10, Bankr. Dkt. Nos. 5 & 6. With respect to the reason for dismissal, the only thing that can be gleaned from the record before the Court is that a motion to dismiss hearing was held, and that one (or more) of the grounds enumerated by Citibank or the trustee required conversion of the plan to Chapter 7 (and in want thereof, dismissal). Govt. Ex. No. 10, Bankr. Dkt. Nos. 43 & 44.[8]

---

[8] Archibald maintains that the 1991 filing was dismissed because the secured debt exceeded the eligibility requirements. Yet, Archibald has not pointed to any evidence of record that supports this contention, and the Court has uncovered none. If true, Archibald may have been well advised to show that the evidence was not as the government claimed or
(continued...)

AO 72A
(Rev. 8/82)

Yet, McEvoy's statement was not so prejudicial as to violate Archibald's due process rights.  The remark was isolated, there is no evidence that the prosecutor made a calculated decision to misrepresent this fact to the jury, and the evidence tending to establish Archibald's guilt was strong and extensive.  Davis v. Zant, 36 F.3d 1538, 1546 (11th Cir. 1994).  The prosecutor's error was not so egregious as to cast doubt over the jury's verdict.  Id. at 1545.

Government counsel's other remarks regarding the prior bankruptcy petition during closing argument were accurate, and proper argumentation.  The prosecutor's questions about Archibald's prior experience with bankruptcy were also appropriate.[9]

---

[8](...continued)
insinuated.  However, to do so may have meant giving the old bankruptcy petition undue attention before the jury.  The Court's function is not to second guess Archibald's trial strategy, and the fact that his tactics were unsuccessful is not cause for overturning his conviction or granting a new trial.

[9]
    The Court rejects Archibald's complaint that the government misrepresented other testimony during the trial of the case, including that of Chris Zachry, the general contractor who built Defendant's house.
    Nor does the Court agree that it erred in failing to sustain Defendant's objection to the prosecutor's comment during closing argument that Rooster's did not have a separate bank account.  The Court cautioned the jury appropriately, stating that "lawyers will frequently disagree about what the evidence is.  You make that decision, it's what you find to be true that you may consider."  Dkt. No. 81, Transcript, Vol. III, at 10.

AO 72A
(Rev. 8/82)

## IV.   ARCHIBALD'S RELIANCE DEFENSE

During the government's case-in-chief, it called Defendant's bankruptcy attorney, Robert Baer, as a witness. Baer testified that he did not discuss the $2,000 entry on the bankruptcy petition for Rooster's with Archibald, and explained that he gave no advice to Archibald regarding how to value Archibald's interest in the business. Baer also stated that he never gave any instructions to his assistant, Kimberly Lacey, regarding how to determine the value of stock for purposes of a petition for bankruptcy.

According to Archibald, Baer's assistant, Kimberly Lacey, told Archibald that the proper entry for the value of the stock in Rooster's was the "face value," or what was paid for it. Because Archibald paid $2,000 to acquire Rooster's stock, he asserted that this was the value he entered on the petition. Accordingly, Archibald maintains that Lacey's advice supports his "advice of counsel's staff" defense.

The following exchange occurred between Archibald's lawyer and Lacey at trial:

Q:  Did you tell him it was suppose[d] to be book value?
. . . .
A:  Okay.  It's possible I could have told him that, yes.
. . . .

31

> Q: Tell us about that.
> A: It's the value that's on the stock certificates that are issued in the corporate book.
> Q: And is that something that you might have discussed with Mr. Archibald?
> A: Yes, possibly.
> Q: And is that where this [$2,000] figure came from?
> A: To the best of my recollection, yes.

Dkt. No. 80, Transcript, Vol. II, at 103-05.

"The reliance defense, to be effective, must establish good faith reliance on an expert coupled with full disclosure to that expert." United States v. Smith, 523 F.2d 771, 778 (5th Cir. 1975); United States v. Miller, 658 F.2d 235, 237 (4th Cir. 1981).

> While it is true that, under certain circumstances, claims of "honest confusion or a lack of understanding," see Colburn, 145 Bankr. at 858, or reliance on poor legal advice, see Ingle, 70 Bankr. at 984, may negate fraudulent intent, such arguments do not necessarily render illegitimate a contrary finding that such intent exists. A lack of understanding claim must be believable. Colburn, 145 Bankr. at 858. Similarly, claims that erroneous answers on a bankruptcy schedule stemmed from bad legal advice suffices as a legitimate excuse only if the finder of fact believes that the reliance was in good faith, Ingle, 70 Bankr. at 984, and if the debtor could not reasonably be expected to provide a sufficient answer without legal counsel. See id. (recognizing the advice of counsel defense only where a question would "require professional assistance in order to be answered truthfully"); Nazarian, 18 Bankr. at 147 (noting that "advice of counsel does not constitute a defense when it is self-evident that the property should be scheduled").

In re Hatton, 204 B.R. 477, 484 (Bankr. E.D. Va. 1997).

AO 72A
(Rev. 8/82)

As these precedents make clear, Archibald's reliance defense is ineffective. First, Archibald has not argued that a lawyer's "office manager/secretary/paralegal" would qualify as an expert under governing law, or offered any support for such a notion. Without some indication that Lacey possessed commensurate education or credentials to support such a finding, the Court doubts that Archibald would be justified in relying on her advice. Additionally, there was no evidence in this case that Archibald made full disclosure to either Lacey or Baer regarding what price he believed Rooster's might bring on the open market.

Leaving aside these deficiencies, the jury was free to disbelieve Archibald's "reliance" defense, and take a contrary view of the evidence. Defendant indicated during his testimony that he was the "boss of the ship," and that he knew more about the value of his interest in Rooster's than anyone else. Dkt. No. 80, Transcript, Vol. II, at 195-196. A reasonable jury could have determined that it should have been self-evident to Archibald that Rooster's current market value was not $2,000. United States v. Calderon, 127 F.3d 1314, 1325 (11th Cir. 1997).

33

V.   **THE JURY NOTE**

During deliberations, the jury sent a note to the Court

containing three questions.  Defendant asserts that the Court's

response to the jury's first question was unclear and possibly

erroneous.

The jury's note inquired:

> Does U.S. Bankruptcy law define the value of
> subchapter S stocks as par value, book value or
> market values?  If not defined specifically, does the
> law assume that this value of subchapter S value has
> come to mean market value through years of common
> use?  Should it be assumed that a bankruptcy attorney
> understands the proper definition of stock value?

Dkt. No. 81, Transcript, Vol. III, at 65.

After the Court read the note to the parties' counsel,

Defendant's attorney stated that bankruptcy law did not define

the value of subchapter S stocks in the terms that the jury had

asked about.  The government's lawyer expressed the view that

"the answer to the first question is on the Bankruptcy Petition

itself, in that it says market value."   Dkt. No. 81,

Transcript, Vol. III, at 66; see Govt. Ex. No. 2 at 7 (column

entitled "CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY

WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION").

The Court then agreed that "market value" would be the

correct answer under the law as to the first question.   Dkt.

34

No. 81, Transcript, Vol. III, at 66, line 23.  Bolstering the conclusion that the Court agreed with the government's response is the fact that the Court and the parties' counsel ignored the jury's second query regarding common usage.  Thereafter, the lawyers and the Court agreed that the answer to the last question was that the jury could not assume anything regarding Defendant's bankruptcy lawyer's knowledge.

After this conference, the Court directed its secretary to type "market value" as the answer to the first question on the jury's note, and to type an answer to the final question explaining that the jury could not assume anything regarding a bankruptcy attorney's knowledge of the appropriate method of stock valuation for purposes of completing the bankruptcy petition.   The Court then signed the jury's note, and a Courtroom Security Officer delivered the note to the jury. Thereafter, the note was lost through some inadvertence.

The Court rejects Defendant's assertion that its answer to the jury's first question was incorrect under bankruptcy law. As the government noted, the bankruptcy petition itself asks the debtor to list the current market value of his property.

35

## CONCLUSION

For the reasons explained above, Archibald's motion for a judgment of acquittal or, in the alternative, a new trial, is **DENIED**. See Dkt. No. 72. Defendant filed a motion to dismiss the indictment previously, arguing that it failed to allege a criminal offense. This motion was denied orally. See Dkt. No. 67. Thus, the Clerk is **DIRECTED** to terminate Docket Number 58 from the pending motions report. Defendant's motion for an extension of time is **DISMISSED** as moot. Dkt No. 72.

**SO ORDERED**, this _____23_____ day of February, 2006.

_____
JUDGE, UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)